ÆTNA INS. CO. et al. v. ALBANY & S. R. CO. et al.

(Circuit Court, S. D. New York. September 18, 1907.)

1. RAILROADS—LEASE—CONSTRUCTION.

A lease by which a railroad company leased in perpetuity all of its property to another company construed, and a provision by which the lessee agreed to pay an annual rent of $490,000, to be made by paying interest on certain specified bonds and dividends on stock at a stated rate, together with a further provision that "if so many shares do not exist at the time of any such payment, or if the sums required for the payments before mentioned shall not amount to the aforesaid $490,000, the balance not applied to the payment of such interest and dividends shall be paid to the said party of the first part," which was the lessor, *held* to entitle the lessor to the benefit of the saving made by refunding the bonded debt,

on which the interest payments were to be made by the lessee, at a lower rate of interest.

**2. SAME—RECOVERY OF RENT—ACTION—LACHES.**

Delay by stockholders of a lessor railroad company in bringing suit to recover sums due from the lessee under the terms of the lease for a time less than that in which an action at law would be barred by limitation did not constitute such laches as to defeat the right of recovery, where the questions involved were complicated and the directors of the two companies were in large part the same persons.

**3. SAME—LEASE—CONSTRUCTION.**

Under a lease of a railroad property in perpetuity, which provided that the lessee would at its own cost repair and keep in order the road, and pay all taxes and assessments upon the railroad property and effects and upon the business done, except income taxes on stockholders and "all expenses for construction, repairs, salaries, and otherwise," the lessee is not entitled to recover from the lessor any sum spent in making improvements on the property, nor in expenses incident to the issuing of new bonds by the lessor, nor for a state tax on its franchise, which, if not a tax on the property or business, was an expense, within such provision.

**4. EQUITY—RAILROADS—LEASE—SUIT BY STOCKHOLDERS ON LEASE—MULTIFARIOUSNESS.**

The fact that the lessee of the property of a railroad company, as required by the lease, indorsed a guaranty of the payment of dividends on the certificates of stock of the lessor, does not render a suit by such stockholders against the lessee to recover sums alleged to be due under the lease multifarious, as based in part on their stock certificates and in part upon the lease; the latter being in fact the source of the guaranty.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 340-379.]

In Equity. On final hearing.

Howland, Murray & Prentice and Edward W. Sheldon (Adrian H. Joline, George Welwood Murray, Edward W. Sheldon, E. Parmalee Prentice, and Charles P. Howland, of counsel), for complainants.

Herbert S. Barnes, for defendant Albany & Susquehanna Railroad Company.

Opdyke, Ladd & Bristow (Charles F. Brown, Lewis E. Carr, William S. Opdyke, and Alfred Opdyke, of counsel), for defendant Delaware & Hudson Company.

HOLT, District Judge. This is a suit in equity, brought by certain stockholders of the Albany & Susquehanna Railroad Company, in behalf of themselves and of all other stockholders of said company who may join in the suit, to recover certain sums alleged to be due from the defendant the Delaware & Hudson Company, as lessee of the Albany & Susquehanna Company. The principal question involved is whether the lessor or the lessee shall have the benefit of the reduction of interest caused by refunding $3,500,000 of bonds issued by the lessor.

The complainants are citizens either of Connecticut or Rhode Island. The defendant the Delaware & Hudson Company is a corporation organized under the laws of New York in 1823, and since duly authorized to lease and operate railroads in New York. The defendant the Albany & Susquehanna Railroad Company is a corporation organized in 1851 under the laws of New York to construct a railroad

from Albany to Binghamton, through the Susquehanna Valley. Its capital stock was fixed at $4,000,000. The road was completed in 1869. In February, 1870, a lease was executed by which the road was leased to the Delaware Company for the full term of its corporate existence. Some of the provisions of this lease were changed by a supplemental agreement executed in March, 1876. The questions involved in this case depend substantially upon the construction to be given to certain parts of the lease and the supplemental agreement.

When the lease was executed, in 1870, there were four mortgages upon the property of the Susquehanna Company. These were: (1) A first mortgage to secure $1,000,000 of 7 per cent. bonds maturing in 1888. (2) Another mortgage, having an equal lien with the first mortgage, to secure payment by the Susquehanna Company of $1,000,-000 of 6 per cent. bonds of the city of Albany, loaned to the Susquehanna Company, maturing in installments of $250,000 on November 1, 1895, May 1, 1896, November 1, 1896, and May 1, 1897. This mortgage provided for a payment to trustees of 1 per cent. per annum for a sinking fund. (3) A second mortgage to secure $2,000,000 of 7 per cent. bonds maturing in 1885. (4) A third or equipment mortgage to secure $500,000 of 7 per cent. bonds maturing in 1881. When the lease was executed, all of above bonds had been issued, except $314,000 of the third mortgage bonds. Of the $4,000,000 of authorized stock, $2,212,600 had been issued as full paid, and $950,000 had been subscribed for and an installment of 10 per cent. paid, leaving $855,000 of stock unpaid. The provisions of the lease bearing upon the questions involved in this case are substantially as follows:

The Delaware Company, in paragraphs 1 and 2, agreed to pay, after January 1, 1871, "the annual rent of $490,000," payable as follows:

Interest on $1,000,000 Albany loan at 6 per cent...................$ 60,000 00
Sinking fund for Albany loan, 1 per cent........................ 10,000 00
Interest on $3,500,000 mortgage bonds at 7 per cent.............. 245,000 00
Dividends on stock not exceeding $2,500,000 at 7 per cent......... 175,000 00

$490,000 00

The lease also provided, in paragraph 2, that:

"If so many shares do not exist at the time of any such payment, or if the sums required for the payments before mentioned shall not amount to the aforesaid $490,000, the balance not applied to the payment of such interest and dividends shall be paid to the said party of the first part [the Susquehanna Company]."

The lease further provided, in paragraph 12, that the lessor (the Susquehanna Company) would, whenever requested by the lessee (the Delaware Company), require the payment in installments of the balance of the 9,500 shares of stock which had been subscribed and on which an installment of 10 per cent. had been paid, and would pay over the installments when collected to the lessee, and the lessee would apply the same to the laying of additional track, the purchase of additional equipment, and other necessary improvements of said road, and would also "pay an additional rental, semiannually, at the rate of 7 per centum per annum on such installments as may from time to time be paid as aforesaid." The lease further provided, in paragraph 13, that in

case the lessee thereafter desired to enlarge the capacity of the road by building a double track, extending the length thereof, or otherwise, the lessor should execute and deliver to the lessee additional stock or bonds as the lessee might require, to be negotiated by the lessee and the proceeds used in such enlargements and improvements of the road; and the lessee would pay to the holders of such stock or bonds dividends or interest thereon at the rate of 7 per cent. as provided in the lease in respect to the then existing bonds or stock. But the total amount of additional bonds should never be such that the aggregate liabilities of the lessor in stock and bonds should exceed $15,000,000. The lease further provided, in paragraph 17, that in case of foreclosure and sale of either of the class of bonds then existing or which might thereafter be created the $7,000,000 of stock and bonds named in the lease should be first fully paid and discharged from the proceeds of such sale. The lease also contained, among other provisions, clauses providing that the lessee should guarantee the dividends and interest on stock and bonds, and should indorse such guaranties on the certificates and bonds, and that the lessee should pay taxes and have general control and management of the leased property, and pay all the expenses involved in such management.

Upon the execution of this lease the Delaware Company took possession of the road, and has controlled and managed it ever since. There were afterwards issued the $314,000 of the third mortgage bonds remaining unissued and $287,400 of stock, making, with the $2,212,-600 already issued, the $2,500,000 of stock, the dividends on which, at 7 per cent. amounting to $175,000, had been agreed to be paid as part of the rent. Thereafter, and before 1876, the Delaware Company expended for double-tracking and improving the road $2,450,-000. For this expenditure it received, under some arrangement, the $855,000 of stock subscribed for, but not issued, in lieu of its proceeds, and also $1,595,000 additional shares of stock, making in all $2,450,000, the amount due. In May, 1872, the Delaware Company had converted, as authorized by the lease, $50,000 of the lessor's third mortgage bonds held by it into $50,000 of stock. The total issue of Susquehanna Company's bonds, aside from the Albany loan, was therefore reduced to $3,450,000, and its capital stock increased to $5,000,000.

The situation, then, was this: The Albany loan was to be paid off at some time in future by the operation of the sinking fund. When that occurred, the $70,000 payable annually on that loan would be payable as rent to the Susquehanna Company. It was intended, when that lease was executed, as appears by the circular issued by the Susquehanna Company to its stockholders on March 31, 1876, that the stockholders then existing should receive the benefit of the saving resulting from the payment of the Albany loan. But the stock had been increased from the $2,500,000 authorized as the basis of rental in the lease to $5,000,000. Of this amount $1,000,000 was an unauthorized overissue. The remaining $4,000,000 was authorized; but, in the absence of any agreement to the contrary, it would all be entitled to share in the $70,000 saved by the redemption of the Albany bonds. There was an agreement in the lease that, in case of foreclosure of any of the

bonds (meaning mortgages) then existing or thereafter created, the $7,000,000 of stock and bonds named in the lease—i. e., $4,500,000 of bonds and $2,500,000 of stock—should be first fully paid and discharged; but there was no provision giving a preference to the $2,500,-000 stock in respect to the $70,000 of rent released by the payment of the Albany loan. Moreover, the clause giving a preference in case of foreclosure made all the stock issued after the $2,500,000 was issued subordinate to such $2,500,000, and no new mortgage could be placed on the property without its being subordinate, not only to any prior mortgages, but also to the quasi lien of this $2,500,000 of stock.

Under these circumstances, on March 7, 1876, a supplementary contract was made between the Susquehanna Company and the Delaware Company, modifying the lease. By this supplemental contract it was agreed: That the total amount of the lessor's capital stock was fixed and limited at $3,500,000, upon which the lessee agreed to pay annual dividends of 7 per cent. That the provision in the lease that the $2,-500,000 of stock should have a preference in case of foreclosure was abrogated. That after the $1,000,000, of the Albany loan should, by the operation of the sinking fund, be paid, the $70,000 a year before required for interest and sinking fund should thereafter be added to the dividends to be paid to the stockholders, thus making dividends of 9 per cent. on $3,500,000 of stock, instead of 7 per cent. on the $2,-500,000 of original stock and on the $855,000 subscribed for and afterwards issued to the lessee. That a new mortgage should be issued by the lessor for $10,000,000, to provide for the payments for outstanding mortgage bonds, to pay the lessee for canceling $1,595,000 of stock which the lessee agreed to cancel and surrender on receipt of bonds to a like amount, and for further expenditures by the lessee on the road. That, of the $10,000,000 of bonds, $3,000,000 should bear interest at 7 per cent. in lawful money of the United States, and the residue, at the option of the lessee, at either 7 per cent. in lawful money of the United States or at 6 per cent. in gold or in sterling. That the payment of the principal and interest of all of said bonds should be guaranteed by the lessee. That all outstanding stock should be called in and new certificates issued. That the lessee should indorse its guaranty on the new bonds and stock. That the total amount of stock and bonds to be issued by the lessor should never exceed in the aggregate $13,-500,000. That all the covenants, agreements, and provisions in the lease contained, "except so far and to such extent as they are changed, altered, or modified by this agreement," shall remain in full force.

After the execution of this supplemental contract, the new consolidated mortgage for $10,000,000 was executed, and $3,000,000 of 7 per cent. bonds were first issued. The Delaware Company received $1,595,000 of such bonds, and canceled and surrendered a like amount of stock, thus reducing the outstanding stock to $3,500,000, as provided in the supplemental contract. The redemption of the outstanding bonds with new bonds was begun. Prior to April, 1881, $660,000 of the old bonds were exchanged for new 7 per cent. bonds. After that date all the remaining old bonds, amounting to $2,790,000, were exchanged for new 6 per cent. bonds; the last bond having been redeemed in November, 1888. In 1906 the entire $10,000,000 of con-

solidated bonds, $3,000,000 of which bore annual interest at 7 per cent. and $7,000,000 at 6 per cent., were taken up by a new issue of $10,000,-000 bonds, bearing annual interest at 3½ per cent.

The Albany loan of $1,000,000 matured in installments of $250,000 on each six months from November 1, 1895, to May 1, 1897. The Delaware Company received from the trustees of the sinking fund $250,000 in November, 1895, and $250,000 in April, 1896, with which it paid each of the first two installments. In November, 1896, it received from such trustees $151,149.40, which was all that had accumulated in the sinking fund. The Delaware Company thereupon borrowed the amount necessary to pay the residue from the Mutual Life Insurance Company, and paid the remaining installments, and took from the Susquehanna Company a debenture bond for $296,378.16, payable in ten semi-annual installments—the first nine being for $35,000 each, and the last for $22,270.74—covering the principal and interest on the bond. This bond was guaranteed, principal and interest, by the Delaware Company. The amount of the installments, as they came due, was in fact paid by the Delaware Company to the Mutual Life Insurance Company. By this arrangement the Albany loan, which had been in fact transferred to the Mutual Life Insurance Company, was in fact paid off in May, 1902, and in 1903 the Delaware Company first paid a dividend of 9, instead of 7, per cent. on the $3,500,000 of stock, as provided in the supplemental contract, and has paid such 9 per cent. dividend annually ever since.

On June 30, 1902, the Albany loan having been finally liquidated in the preceding May, it is admitted that there was a balance of $23,896.02 accrued upon rental account payable to the lessor. The lessee credited this sum to its profit and loss account, claiming that it had paid out larger amounts for the account of the lessor, which it was entitled to set off against the amount so credited. This sum of $23,896.02 is therefore admittedly due from the lessee to the lessor, unless its claims of set-off are valid. That question will be considered later. The complainants claim in this case that the Susquehanna Company, or its stockholders, are entitled to receive from the Delaware Company whatever saving was made by refunding any of the original 7 per cent. bonds for $3,500,000 with 6 per cent. bonds, between 1881 and 1888, and by refunding the substituted bonds with 3½ per cent. bonds in 1906, and also the sum of $23,896.02 accrued on rental account June 30, 1902.

I will first consider the question whether the lessor or the lessee is entitled to the interest saved on refunding the bonds. Upon this question, in my opinion, the controlling fact is that the instrument by which the Susquehanna Company transferred its railroad to the Delaware Company was a lease, reserving a fixed annual rent. The Delaware Company, by that instrument, did not simply agree, in consideration of the transfer of the road, to pay all dividends and interest to accrue on the outstanding stock and bonds, and to indemnify the Susquehanna Company for liability therefor. It agreed, as a lessee, to pay a rent of $490,000. It is true that this rent was to be paid by the lessee by paying certain specified dividends and interest to accrue on certain stock and bonds and the annual contribution to the Albany loan sink-

ing fund; but the lease also provided that, if the sums required for such payments should not amount to the said $490,000, "the balance not applied to the payment of such interest and dividends shall be paid to the party of the first part" (the Susquehanna Company). The full rent of $490,000, therefore, was in all events to be paid by the lessee; and if, for any reason or in any contingency, any part of it should not be required to pay the specified dividends, interest, or sinking fund contribution, such part became, by the express terms of the lease, payable to the Susquehanna Company. If there had been a simple rent fixed of $490,000 in cash, to be paid by the Delaware Company directly to the Susquehanna Company, and the Susquehanna Company had itself distributed it in payment of the dividends, interest, and sinking fund contribution, I do not see how it could be claimed that a refunding of the bonds, causing a diminution in the interest charge, would reduce the rent or inure in any way to the benefit of the Delaware Company, or of anybody except the Susquehanna Company.

The question, therefore, is: Did the fact that the Delaware Company, under the arrangement, paid the dividends and interest directly to the stockholders and bondholders, instead of first paying it to the Susquehanna Company, to be by it distributed, essentially change the relations and rights of the parties? I cannot think so. The arrangement by which the Delaware Company paid the dividends and interest direct to the stockholders and bondholders was one simply for its convenience. It saved the trouble and expense of keeping two sets of accounts and two sets of clerks and bookkeepers. The liability of the Susquehanna Company on the bonds and stock was legally the principal and primary liability; that of the Delaware Company was, in strictness, merely that of a guarantor, and was secondary. It is probably true that the great financial strength and high credit of the Delaware Company gave to its obligation a greater weight than the obligation of the Susquehanna Company; but the fundamental security for the bonds and stock, in this case as in all cases, was the railroad property of the Susquehanna Company, which secured the bonds by the lien of the mortgages upon it, and which constituted the plant with which the business was done which earned the dividends on the stock.

The defendants' counsel argues that the provision in the lease that, if the sums required for the payments therein mentioned should not amount to $490,000, "the balance not applied to the payment of such interest and dividends shall be paid to the said party of the first part," provides only for any balance accruing until the full amount of $3,-500,000 of bonds and $2,500,000 of stock should be issued. It will be recalled that when the lease was made $314,000 of bonds under the third mortgage and $287,400 of stock remained to be issued. As the items to which the $490,000 of rent was appropriated included 7 per cent. interest on $3,500,000 of bonds and 7 per cent. dividends on $2,500,000 of stock, it is apparent that, until such $314,000 of bonds and $287,400 of stock were issued, there would be a balance to be paid to the Susquehanna Company. The defendants' counsel claims that this was the only balance referred to in the lease; that, as soon as such $314,000 of bonds and $287,400 of stock were issued, the provision became no longer operative; and that any subsequent diminution of the

amount necessary to be paid by the Delaware Company, by a reduc-
tion of the interest charge or otherwise, was not affected by the clause
in the lease under consideration. But I cannot so construe the clause.
I have no doubt that it would apply, and did apply, to any balance, if
there was any, resulting from delay in the issue of such unissued bonds
and stock. But, in the first place, there was no delay. The evidence
shows that there was issued on April 5, 1870, $150,200, and on April
15, 1870, $137,200, of stock, making the exact amount of $287,400.
It may be assumed that the bonds were issued about the same time.
Full interest on $500,000 third mortgage bonds was paid in November,
1870. Obviously, unless it was intended or expected, at the time the
lease was executed, that the stock and bonds should not be issued for
a considerable time, little weight can be given to the argument that
the "balance" mentioned in the lease meant the balance to be paid until
such stock and bonds were issued.

But, aside from these considerations, I can see no ground for putting
such a restricted meaning on the clause. Its language is general and
comprehensive. It says that "if the sums required for the payments
before mentioned" (i. e., 6 per cent. interest and 1 per cent. sinking fund
on $1,000,000 Albany loan, 7 per cent. interest on $3,500,000 bonds,
and 7 per cent. interest on $2,500,000 of stock) "shall not amount to
the aforesaid $490,000, the balance not applied to such interest and
dividends shall be paid to the party of the first part." This applied,
in my opinion, to any reduction of the amounts required for any of
such payments, whether for interest or dividends, from any cause what-
ever, either existing or afterwards arising, and whether then foreseen
or entirely unanticipated.

The defendants' counsel claims that the provisions of the supple-
mental contract relating to the payments to be thereafter made by the
lessee to the lessor not only modified, but entirely abrogated and super-
seded, the provisions of the lease relating to the same subject. It
is argued that as, in 1876, when the supplemental contract was made,
the Albany loan of $1,000,000 was not to mature before 1895, while
the other $3,500,000 of bonds were to mature, those secured by the
third mortgage in 1881, by the second mortgage in 1885, and by the
first mortgage in 1888, the fact that the supplemental contract only
provided for an increase of dividends on the $3,500,000 of stock from
7 to 9 per cent. when the Albany loan should be paid, shows that the
parties did not intend any increase of rent by reason of any diminu-
tion of the interest rate on the $3,500,000 of bonds. It is urged that
the parties knew that the $3,500,000 bonds would mature first; that
provision was made in the contract for taking them up with new bonds,
which might bear interest either at 6 or 7 per cent. at the option of
the lessee; that they were taken up principally with 6 per cent. bonds;
and that, as the contract made no provision for increasing the dividend
by reason of such saving, it must be assumed that the supplemental
contract abrogated the provisions of the lease relating to rent, and
substituted its own provisions in their place. But the seventh para-
graph of the supplemental contract provided expressly that all the
covenants, agreements, and provisions in the lease contained, "except

so far as they are changed, altered, or modified by this agreement, shall be and remain in full force."

The question is, therefore: Did the supplemental contract change, alter, or modify the provision of the lease that, if the amounts required for the payment of the interest and dividends required by the lease shall not amount to $490,000, the balance, not applied to the payment of such interest and dividends, shall be paid to the lessor. Admittedly it did not in express terms. But it is claimed that the provisions relating to payments in the supplemental contract make so complete and comprehensive a change in the entire scheme of payment that it is to be deemed to have entirely abrogated the provisions of the lease upon that subject. But I cannot accede to this view. It is true that the three mortgages for $3,500,000 were all to mature before the Albany loan, and that both parties knew it. But it was certain that the Albany loan would be at some time paid by the operation of the sinking fund, while it was not contemplated that any of the $3,500,000 of bonds would be paid at maturity. It was provided by the contract that they should be taken up at maturity by new bonds, which should bear interest at either 7 or 6 per cent. But it probably was not contemplated at that time, at least as anything more than a possibility, that these original 7 per cent. bonds would be renewed by 6 per cent. bonds. The legal rate of interest in New York was not changed from 7 to 6 per cent. until 1879, and no 6 per cent. bonds appear to have been in fact issued until 1881. Of the $3,000,000 of 7 per cent. bonds authorized in the new issue of $10,000,000, it appears in evidence that $1,595,000 was immediately issued to the Delaware Company in exchange for its surrendered stock, and $660,000 was during the succeeding five years issued in refunding old bonds, and it therefore appears probable that it was not until 1881 that a 6 per cent. bond could be successfully put out. None of the old bonds matured before that year.

The real points in the minds of the parties when the supplemental contract was made clearly appear in the circular issued by the Susquehanna Company to its stockholders in 1876. The principal thing needing correction was the overissue of stock. $5,000,000 had been issued. Of this $1,000,000 was an overissue. But, if the stock were reduced to $4,000,000, the authorized capital, the result still would be that the liquidation of the Albany loan would not accrue, as was intended, to the benefit of the original holders of about $2,500,000 of stock, but would have to be distributed in dividends on the entire $4,000,000 of stock. Under these circumstances, the supplemental contract provided, in substance, that the total stock issued should be $3,500,000, an amount probably arrived at by substantially uniting the amounts of $2,500,000 of original stock and the $855,000 of subscribed stock, dividends on which, by the terms of the lease, were payable as rent; that there should be a 7 per cent. dividend on such amount until the Albany loan was paid, and thereafter a 9 per cent. dividend; that the preference of the $7,000,000 of bonds and stock, in case of foreclosure, should be abrogated; that the principal, as well as interest, of all bonds should be guaranteed by the lessee; and that the total amount of stock and bonds to be issued should be limited to $13,500,000, instead of $15,000,000, as provided in the lease. In all these provisions

of the contract I cannot see anything abrogating the provisions of the lease. So far as they modify it, it is modified; but the provisions which are modified all relate to the dividends on the stock, and have nothing to do with the interest on the bonds. In my opinion, all the provisions of the lease which give the lessor the benefit of any reduction in the interest charge remained in full force after the supplemental contract and were entirely unaffected by it.

The defendants' counsel claims that the Albany loan was not paid by the operation of the sinking fund, and that therefore the provision in the supplemental contract that, after the Albany loan "shall, by the operation of the sinking fund, provided for the payment of said bonds, be paid," the sum of $70,000 shall be added to the dividends paid to stockholders, never became operative. But, in the first place, I do not see that this point is material to any question in controversy in this case. The complainants do not charge that anything is due on dividends on stock. Their claim relates wholly to the reduction of interest on bonds. But, in my opinion, on the merits, the Albany loan was paid by the operation of the sinking fund, within the meaning of the contract. It is true that when it matured the sinking fund only amounted to about $650,000. The Delaware Company borrowed from the Mutual Life Insurance Company the necessary amount to pay the deficiency, and paid the entire loan to the city of Albany. It then went on under substantially the original arrangement and ultimately paid off the loan to the Mutual Life Insurance Company. If the city of Albany had extended the loan until the time it was finally paid to the Mutual Life Insurance Company, it would have been paid by the operation of the sinking fund, and, in my opinion, the fact that the sinking fund did not raise the necessary amount as quickly as was expected, and that the Mutual Life Insurance Company was substituted as a creditor in place of the city of Albany, did not change the fact that the loan was ultimately paid off by the operation of the sinking fund. Moreover, the Delaware Company recognized by its action that the provision in the supplemental contract had become operative. In 1903, the year after the final payment on the loan was made, it began, and has since continued, the payment of the dividend of 9, instead of 7, per cent.

The defendants claim that the complainants' right to recover is barred by laches and acquiescence, and, in part at least, by the statute of limitations. This action is brought upon a sealed instrument. I think, therefore, that 20 years is the period of limitation. This suit was begun June 12, 1906. Therefore any recovery is barred for amounts saved by any exchange of bonds before June 12, 1886. Courts of equity usually follow the limitations fixed by the statutes; but in gross cases of laches and acquiescence they refuse relief, although the full period fixed by statutes of limitation has not passed. But I do not think that this is such a case. The attention of the stockholders of the Susquehanna Company may naturally not have been called to the subject of the saving of interest until the refunding of the consolidated loan of $10,000,000 in 1906. The Albany loan was not cleared off till 1902. That was the time when the stockholders would naturally look for an increase in the dividends to 9 per cent., and it imme-

diately followed. The board of directors of the lessor was practically the board of directors of the lessee. The stockholders were receiving a large income on their investment. The question of the construction of the effect of the supplemental contract upon the lease was an obscure and difficult one, requiring an investigation of complicated facts, and it was natural that the stockholders should have acquiesced in whatever was done by the officers of the Delaware Company without investigation.

The question whether the Delaware Company had the right to withhold payment of the sum of $23,896.02, accrued on rental account on June 30, 1902, depends on the question whether it had valid claims against the Susquehanna Company for advances made for its account, which it could set off against it. These claims are: A claim for expenditures in improving the railroad property in excess of the amount for which the Delaware Company was entitled to receive securities of the Susquehanna Company. The amount of this excess is $2,033,603.07. A claim for taxes on the franchise of the Susquehanna Company, imposed under the New York franchise tax law, amounting to $152,345.46. A claim for the expenses of the transfer of stock and bonds of the Susquehanna Company, amounting to about $25,000. A claim for the expenses of issuing and engraving the new 3½ per cent. bonds in 1906, amounting to $18,275.39. A claim for payment of the state tax on the $10,000,000 mortgage made in 1906, amounting to $12,465.75.

In my opinion, none of these claims are valid. The lease is a perpetual lease. It transferred all the assets of the Susquehanna Company. The road, after its execution, became a part of the Delaware Company's system. The expenditures were made in furtherance of the Delaware Company's business. The lease expressly provided, in paragraph 3, that the lessee would, at its own cost, repair and keep in order the road; in paragraph 5, that it would pay all taxes and assessments of every description assessed "upon the railroad property and effects herein described and upon the business done upon the said railroad," except income taxes on stockholders, and that it would "pay all expenses for construction, repairs, salaries, and otherwise, which may be necessarily incurred on account of the railroad and demised premises"; and, in paragraph 14, that it might make, at its own expense, all such alterations, improvements, and additions in or to the property demised as might be proper for its full enjoyment for railroad purposes. I think that under these provisions all of said expenditures were made by the lessee on its own account. The point that the franchise tax was not a tax on the railroad or its business, and therefore was not provided for, seems to me untenable. Such a tax has been held by some courts to be a tax on the stock, and by other courts on the business. If it is neither, I think it was covered by the general provision for the payment of all taxes except income taxes; and, if not, by the general provisions for the payment of all expenses. The whole scheme of the lease shows that all future expenses of the Susquehanna Company's road were to be borne by the Delaware Company.

Various defenses were interposed in this case which were raised by a demurrer. The demurrer was overruled. They have been again urged and elaborately argued on the brief of the defendants' counsel. The fact that they were heard and overruled on the demurrer would perhaps make it unnecessary to consider them further; but as I gave no written opinion on the decision of the demurrer, and as these defenses were strenuously urged on the argument, I will briefly give my reasons for holding them insufficient.

It is claimed that the bill is multifarious, because uniting a claim by the stockholders in their separate individual right for increased dividends on their stock and a claim of the Susquehanna Company asserted by the stockholders, for the $23,896.02 due on rental account on June 30, 1902. This claim is based, as I understand it, on the fact that the Delaware Company indorsed on each stockholder's certificate a guaranty of the payment of dividends, upon which each stockholder could have brought a suit at law. But such indorsed guaranty was not exclusively the basis of the stockholder's claim against the Delaware Company. The lease contained the original agreement to guarantee. Its indorsement on each certificate simply gave the stockholder an additional evidence of it. But the obligation was created by the lease before the guaranty was indorsed on the certificates. Suppose the Delaware Company inadvertently or intentionally omitted to indorse some or all of the certificates. Could not the Susquehanna Company have enforced the guaranty? And, if it could in that case, why cannot it now? I think that the complainants, in their derivative capacity, as representing the corporation, can maintain this suit to enforce each claim made in this case and every liability existing under the lease and the supplemental contract.

The defendants' counsel also urges that the evidence does not sufficiently establish that a demand on the Susquehanna Company to bring the action would have been futile when the suit was brought. But I think that that fact clearly appears from all the evidence in the case.

My conclusion is, therefore, that the complainants are entitled to recover in this suit $23,896.02 accrued on rental account, and interest from June 30, 1902, and whatever amounts have been saved by the refunding of the bonds, with interest and costs. Several computations have been made and put in evidence, showing such amounts. They have been made on different theories of computation, showing different amounts claimed to be due, ranging from about $900,000 to about $1,286,000. The amounts involved are large, the computations are complicated, and the question of the correct method of computation was very little discussed in the briefs or arguments. I think there should be a reference to a master to take testimony, if additional testimony is desired by either party, and to report as to the exact amount due.

The decree should be settled on notice.